# New Home Federal Savings and Loan Association v. Trunk

*Lawrence M. Thompson, Jr.,* for plaintiff.
*John L. Sampson,* for defendant.
*Christopher M. Patterson,* for terre-tenants.

MUELLER, *J.,* June 23, 1982 — On February 23, 1979, defendant Joseph A. Trunk, hereinafter referred to as Trunk purchased a house located at 276 West Walnut Street, Marietta, Pa. Trunk paid $2,800 down in cash and borrowed the balance of $25,200 from plaintiff New Home Federal Savings and Loan Association (hereinafter referred to as plaintiff) with a mortgage to secure the repayment of the loan. The note required Trunk to repay plaintiff over a term of 25 years with interest at the rate of ten percent per annum. The mortgage form was a standard form used by plaintiff since 1975, the FNMA/FHLMC Uniform Instrument, and contained a "due-on sale" clause set forth in Paragraph 17:

"17. *Transfer of the Property; Assumption.* If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Mortgage, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable. Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the Property is to be sold or transferred reach agreement in writing that the credit of such person

is satisfactory to Lender and that the interest payable on the sums secured by this Mortgage shall be at such rate as Lender shall request. If Lender has waived the option to accelerate provided in this paragraph 17, and if Borrower's successor in interest has executed a written assumption agreement accepted in writing by Lender, Lender shall release Borrower from all obligations under this Mortgage and the Note.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof."

Paragraphs 18 and 19 of the mortgage agreement provide:

"18. Acceleration; Remedies. Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall mail notice to Borrower as provided by applicable law specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to

reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender at Lender's option may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorney's fees, and costs of documentary evidence, abstracts and title reports.

19. Borrower's Right to Reinstate. Notwithstanding Lender's acceleration of the sums secured by this Mortgage, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to at least one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage, the Note and notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage and in enforcing Lender's remedies as provided in paragraph 18 hereof, including, but not limited to, reasonable attorney's fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower,

this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred."

Trunk admits that he read the mortgage note and mortgage documents at settlement.

Trunk took possession of the premises and resided there until October 1979 when he moved out. He leased the premises from October 1979 until February 1981. On February 21, 1981, Trunk entered into an installment agreement for the sale of real estate with defendants Barry J. Tierney and Rosaura F. Tierney, hereinafter referred to as Tierneys for the purchase of the premises. The terms of the installment sale agreement provided that the Tierneys would pay Trunk $1,000 upon the signing of the agreement, $2,000 at settlement and the balance of $30,900 with interest on the unpaid balance at 12 percent per annum, payable in monthly installments beginning May 1, 1981 and continuing until May 1, 1984 when the entire unpaid principal balance was to become due. Upon payment of the principal balance Trunk agreed to deliver a deed to the Tierneys. The Tierneys took possession of the premises in April 1981 and are still in possession.

Plaintiff became aware of the installment sale agreement in April 1981 and sent a letter to Trunk captioned "Notice of Default and Intention to Foreclose Under Section 403 of Act No. 6, Approved January 30, 1974, S.B. 1255." The letter stated, in part:

"This is a notice of default and of our intent to foreclose on your mortgage . . . Your mortgage is in default because you have sold the mortgaged property without obtaining our prior written consent as required by the mortgage. We hereby demand that

all sums secured by the mortgage are immediately due and payable . . . If we do not receive the required payment (sic) within thirty-five (35) days after the date of this notice, we may without any further notice to you, do any of the following:

1. We may begin legal proceedings to foreclose the mortgage, in which proceedings the Sheriff may sell your house.

2. We may take possession of your property and proceed to have you ejected from the property.

3. We may sue you personally for the said unpaid principal balance and all other sums due under the mortgage."

No mention was made in the letter of either Trunk's right to cure or Trunk's right to reinstate after acceleration as provided by Paragraphs 18 and 19 of the mortgage agreement.

Trunk has not defaulted on the monthly mortgage payments due to plaintiff. He has maintained the property as required and paid all the taxes and insurance premiums. Plaintiff does not contend that its security has been impaired by Trunk's installment sale agreement with the Tierneys. Plaintiff's sole motive in enforcing the due-on-sale clause is to eliminate a mortgage bearing a ten percent annual interest rate in view of the much higher current interest rates.

Plaintiff commenced this mortgage foreclosure action against Trunk and the Tierney's on September 10, 1981. Trunk filed an answer, new matter and counterclaim against plaintiff and raised a number of issues. Trunk claims in new matter that (1) an installment sale agreement is not a sale or transfer of the property or an interest in the property within the meaning of Paragraph 17, (2) the installment sale agreement is a lien or encum-

brance subordinate to the mortgage as contemplated by Paragraph 17(a), (3) the notice sent to him by plaintiff was defective under Paragraph 18 of the mortgage agreement and in violation of section 403(a) of Act 6 of January 30, 1974, P.L. 13, 41 P.S. §403(a), (4) Paragraph 19 of the mortgage agreement gave him a right to cure, (5) Paragraph 17 is a covenant rather than a condition so as to limit damages to actual damages rather than forfeiture by acceleration, (6) the due-on-sale clause is a contract of adhesion because he had no opportunity to bargain with respect to this provision, and (7) the due-on-sale clause is an unreasonable restraint on alienation and invalid where the lender's security is unimpaired and the sole motive behind enforcing the clause is to reinvest the proceeds loaned at a higher rate of interest. Trunk's counterclaim alleges that the foreclosure action instituted by plaintiff may prevent performance of the installment sale agreement and requests "an amount equal to the difference between the sum owed by defendant Trunk to plaintiff on the aforesaid note and mortgage and that sum owed by defendants Tierney to defendant Trunk on the aforesaid installment sale agreement." Paragraph 23. Trunk further alleges in the counterclaim that "Pa.R.C.P. 1144(a) and 1145(a) do not require or authorize joinder of a terre-tenant as a defendant in a mortgage foreclosure action." Paragraph 24.

Tierneys also filed an answer and new matter averring that plaintiff's security has not been impaired, that the sole purpose of the foreclosure action is to force them to renegotiate the mortgage at a higher rate of interest and that the due-on-sale clause constitutes an unreasonable restraint on alienation.

Plaintiff has filed a reply to the new matter and

counterclaim of defendant Trunk and a reply to the new matter of defendants Tierneys.

Now before the court are plaintiff's motion for summary judgment and Trunk's motion for summary judgment. As the Pennsylvania Supreme Court stated in Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 204, 412 A. 2d 466 (1980):

"Rule 1035 permits the entering of a summary judgment only if the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

The moving party has the burden of proving that there is no genuine issue of fact: Kent v. Miller, 222 Pa. Superior Ct. 390, 294 A. 2d 821 (1972). All doubts as to the existence of a genuine issue of fact must be resolved against the moving party: Ritmanich v. Jonnel Enterprises, Inc., 219 Pa. Superior Ct. 198, 280 A. 2d 570 (1971).

Briefs have been filed by all parties, and oral argument was held. The parties agreed at oral argument that, with the exception of the issue of whether the due-on-sale clause was a contract of adhesion which Trunk claims is a jury question, all issues were issues of law to be decided by the court.

Defendants conceded at oral argument that a transfer of an interest in the property did occur since equitable interest and possession did pass to the Tierneys upon the signing of the installment sale agreement. This concession is in accord with the position taken by courts of other jurisdictions. Courts have consistently held that a sale of mortgaged property by installment contract is a sale for purposes of triggering the due-on-sale clause. See e.g., Tucker v. Lassen Sav. & Loan Ass'n, 526 P. 2d

1169 (Cal. 1974); Bellingham First Federal Sav. & Loan Ass'n v. Garrison, 553 P. 2d 1090 (Wash. 1976); Terry v. Born, 604 P. 2d 504 (Wash. 1979). But see, Chopan v. Klinkman, 330 So. 2d 154 (Fla. App. 1976). Trunk further conceded that his counterclaim was not to be seriously considered in that it was vague and premature.

The questions still before the court are as follows:

(I) Is the installment sale agreement "subordinate to Plaintiff's mortgage" so as to fall into the exception of the due-on-sale clause provided for in Paragraph 17?

(II) Was the notice defective?

(III) Is the due-on-sale clause invalid as an unreasonable restraint on alienation where the lender's security is unimpaired and the sole motive of the lender in enforcing the clause is to reinvest the money at the current higher interest rate?

(IV) Is the due-on-sale clause a contract of adhesion, and is this a question that must be answered by a jury?

## I.

Trunk argues that the installment sale agreement is a lien subordinate to plaintiff's mortgage within the meaning of Paragraph 17 which excepts subordinate liens from transfers that trigger the due-on-sale clause. Trunk cites the case of Anderson Contracting Co. v. Daugherty, 274 Pa. Superior Ct. 13, 417 A. 2d 1227 (1979). The court in Anderson held at p. 22-23: that:

"[F]or the purposes of Act No. 6 [of January 30, 1974, P.L. 13, 41 P.S. §101 et seq., which allows a mortgagor to cure a default at any time up to one hour prior to commencement of bidding at sale], a vendor under a land installment contract will be

deemed to be 'secured by a lien upon real property . . .' "It is our opinion that the rights and remedies provided by Act No. 6, in particular, the cure provisions of Section 404 of the Act, 41 P.S. §404, should not be denied to a class of Pennsylvania home purchasers solely because their obligation to pay the balance of the purchase price is evidenced and secured by a land installment contract as opposed to some other transaction also designed to create a security interest in real estate."

The decision of the court was based upon the apparent intent of the legislators in drafting Act no. 6 and the rationale behind the enactment. "[S]everal factors convince us that the framers of Act no. 6 did not intend the 'fit' to be so tight that the lien requirement be met with absolute precision." At 20. The court did not conclude that an installment sale agreement was a lien but only that, for purposes of Act no. 6 the interest which, "strictly speaking is not a lien, may be enforced as though it were." At 22. The court in Anderson did not enunciate a sweeping new rule with respect to installment sale contracts as liens but rather acknowledged the general rule in Pennsylvania "that '[a] person cannot own an article and at the same time have a lien upon it: Atlantic Finance Corp. v. Kester, 156 Pa. Superior Ct. 128, 136, 39 A 2d 740, 744 (1944).'" At 20.

This court finds that the narrow holding of Anderson is not applicable to the issue of construing the language of the contract between plaintiff and Trunk.[1] Instead, the court finds that the general Pennsylvania rule applies, and the installment sale

1. It would apply to give the Tierneys the benefit of Act no. 6 if they defaulted on their installment sale agreement with Trunk.

agreement is not a lien subordinate to the mortgage.

We note that this position is consistent with rulings on the issue by other courts. The United States Court of Appeals for the Fourth Circuit in Williams v. First Federal Sav. & Loan Ass'n, etc., 651 F. 2d 910 (4th Cir. 1981) interpreted the phrase "lien or encumbrance subordinate" to the mortgage as these words appear in Paragraph 17 of the FNMA/FHLMC Uniform Mortgage Instrument, which was used by plaintiff, to mean a claim upon the property which would be security for a debt, not a beneficial ownership interest. The court said at p. 920, 921:

"While subordinate to the deed of trust, the right to 'enjoy the structure as their home' was not a 'lien or encumbrance.' It was not for the purpose of securing an obligation. The deed of trust in favor of First Federal Savings and Loan Association of Arlington securing the note was lien or encumbrance; the interests of the Williams were not. Rather, in every realistic sense, their interest, regardless of whether, for some purposes, it was real or personal property, was a fee simple, i.e., beneficial, ownership, subject to the security interest created by the first deed of trust securing the note to First Federal Savings and Loan Association of Arlington.[22]

"Fn. 22. A beneficial ownership interest is not an encumbrance. *See, e.g., Annotated Code of Virginia* §8.9-105(g): '"Encumbrance" includes real estate mortgages and other rights in real eatate *that are not ownership interests;*' (Emphasis supplied.)

The overly broad meaning which the appellants seek to attach to 'lien and encumbrance' would encompass any interest created in the property. It

thereby would cause what was clearly meant as a limited exclusion from the due-on-sale clause applicable in a few cases only to expand so hugely as to swallow-up and extinguish altogether the due-on-sale clause itself. That argument, consequently, fails . . .

It is absurd to think, as appellants argue, that the provision was meant to take away completely with one hand what the Bank Board was plainly conferring with the other." (Footnote omitted).[2]

Appellants do not appear to contend that the beneficial ownership interests are a 'lien.'

They are right not to do so. While that term is capable of a variety of uses, here it evidently signifies the customary meaning: 'a claim . . . upon the property . . . as a security for some debt or charge.' 2 Bouvier's Law Dictionary, p. 1978. Again, beneficial ownership interests are not encompassed within the word 'lien.'

In sum, the rights to beneficial ownership, possession, and enjoyment fall outside the concept of 'lien or encumbrance.'"

The court also finds that there was no ambiguity in the language of Paragraph 17 of the mortgage agreement so as to require us to construe the contract in favor of Trunk. See Williams supra, p. 919.

## II.

Trunk has raised, briefed and argued the issue of

---

2. Furthermore, the Federal Home Loan Mortgage Corporation and the Federal Home Loan Bank Board have indicated in unofficial opinions that the exception applies only to the creation of a lien upon the borrower's interest, not to a sale of the property or a transfer of the interest: Enforcement of Due-on-Transfer Clauses: An Update, 16 Real Prop. Prob. & Tr. J. 291 (1981).

whether the notice sent to him by plaintiff was defective for not complying with Paragraph 18 of the mortgage which required plaintiff to notify Trunk of its intent to accelerate *prior* to acceleration and of Trunk's right to reinstate upon cure of default. Trunk also argues that section 403 of Act no. 6 of January 30, 1974 requires the lender to give 30 days notice of intention to foreclose and also to inform the debtor of the debtor's right to cure as provided for in section 404: 41 P.S. §§ 403 and 404[3]

---

3. §403 Notice of intention to foreclose

(a) Before any residential mortgage lender may accelerate the maturity of any residential mortgage obligation, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the residential mortgage debtor for such residential mortgage obligation, such person shall give the residential mortgage debtor notice of such intention at least 30 days in advance as provided in this section.

(b) Notice of intention to take action as specified in subsection (a) of this section shall be in writing, sent to the residential mortgage debtor by registered or certified mail at his last known address and, if different, at the residence which is the subject of the residential mortgage.

(c) The written notice shall clearly and conspicuously state:

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default as provided in section 404 of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;

(4) The time within which the debtor must cure the default;

(5) The method or methods by which the debtor's ownership or possession of the real estate may be terminated; and

(6) The right of the debtor, if any, to transfer the real estate to another person subject to the security interest or to refinance the obligation and of the transferee's right, if any, to cure the default.

Trunk also argued that the notice incorrectly stated "the nature of the default claimed" because the notice said that Trunk "sold" the property but an installment sale is not a sale. We find this argument without merit on the grounds that an installment sale is a sale and that Trunk was adequately advised of the transaction that plaintiff claims constituted default.

The court now turns to the questions of Trunk's right to prior notice and right to cure and notes that the value to Trunk of prior notice is dependent on

---

(d) The notice of intention to foreclose provided in this section shall not be required where the residential mortgage debtor, has abandoned or voluntarily surrendered the property which is the subject of a residential mortgage.

§404. Right to cure a default

(a) Notwithstanding the provisions of any other law, after a notice of intention to foreclose has been given pursuant to section 403 of this act, at any time or at least one hour prior to the commencement of bidding at a sheriff sale or other judicial sale on a residential mortgage obligation, the residential mortgage debtor or anyone in his behalf, not more than three times in any calendar year, may cure his default and prevent sale or other disposition of the real estate and avoid acceleration, if any, by tendering the amount or performance specified in subsection (b) of this section.

(b) To cure a default under this section, a residential mortgage debtor shall:

(1) Pay or tender in the form of cash, cashier's check or certified check, all sums which would have been due at the time of payment or tender in the absence of default and the exercise of an acceleration clause, if any;

(2) Perform any other obligation which he would have been bound to perform in the absence of default or the exercise of an acceleration clause, if any;

(3) Pay or tender any reasonable fees allowed under section 406 and the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment.

(4) Pay any reasonable late penalty, if provided for in the security document.

whether he has the right to cure. Plaintiff contends that these objections as to the adequacy of the notice and the right to cure are controlled by the decision of the Superior Court in Min. & Mission. Ben. Bd. v. Goldsworthy, 253 Pa. Superior Ct. 321, 333, 385 A. 2d 358 (1978):

"Although Section 404 does not specify the type of default which may be cured, we agree with appellee that this section relates almost exclusively to monetary defaults. Thus to cure a default, subsection (b) directs that the mortgagor 'pay or tender' all delinquent sums, together with reasonable fees and costs, and any late penalty, and that the mortgagor 'perform any other obligation which he would have been bound to perform. . . .' Clearly, appellant could cure a default resulting from nonpayment of principal and interest. Equally clear, however, is the fact that appellant could not cure a default based on conveyance of the premises in violation of the mortgage agreement."

At oral argument counsel for Trunk and the Tierneys attempted to distinguish Goldsworthy on the basis that the mortgagor in that case had conveyed the property outright, but Trunk had entered into an installment sale agreement. Defendants' counsel suggested that the right to cure was not meaningless because the Tierneys could agree to breach the installment sale agreement and their interest would revert back to Trunk. This distinction is not valid. In the case of a monetary default the mortgagor can cure the default by his own action, paying the money owed. There would be no need for collusive action with a third party not bound by any obligation to the original lender. Tierneys may or may not agree to default, but Trunk, the mortgagor and the party who must effect the cure, has no right

to compel his buyer to default. This is analogous to the situation in Goldsworthy where the transferee *might* have agreed with the transferor to reconvey the property and so "cure" the default.

## III.

Both Trunk and the Tierneys argue that the due-on-sale clause is invalid under Pennsylvania law as an unreasonable restraint on alienation where the lender's security is unimpaired.

The general law in Pennsylvania on restraints on alienation is well established: "Every restraint on alienation of real property is not necessarily void. True, such restraints are not favored in the law. Further, an absolute restraint is against public policy and, therefore, of no legal effect. However, a limited and reasonable restraint on the power of alienation may be valid. See, Restatement, Property, §406, and 26 C.J.S., Deeds, §145."

Lauderbaugh v. Williams, 409 Pa. 351, 355, 186 A. 2d 39 (1962). No Pennsylvania appellate court has, however, addressed the precise issue of whether the due-on-sale clause is an unreasonable restraint on alienation. The Superior Court in Min. & Mission Ben. Bd. v. Goldsworthy, supra, at 329, while deciding that Act no. 6, which allows for cure of a mortgagor's default, was not an unconstitutional impairment of the mortgage obligation, said "Generally, a provision in a mortgage agreement according the mortgagee the option to accelerate the maturity of the mortgage debt, under certain conditions or upon the happening of specified events, is regarded as a legitimate contractual stipulation. See 55 Am. Jur. 2d, Mortgages, §§371-393." This case provides the only guidance to be found in Pennsylvania.

The courts of other states have split sharply on this issue. The Supreme Court of Arkansas in Tucker v. Pulaski Federal Sav. & Loan Ass'n, 481 S.W. 2d 725 (Ark. 1972), the Supreme Court of Mississippi in Sanders v. Hicks, 317 So. 2d 61 (Miss. 1975), the Arizona Supreme Court in Patton v. First Federal Sav. & Loan Ass'n of Phoenix, 118 Ariz. 473, 578 P. 2d 152 (Ariz. 1978), the Washington Supreme Court in Bellingham First Federal Sav. & Loan Ass'n v. Garrison, 87 Wash. 2d 437, 553 P. 2d 1090 (Wash. 1976), the Michigan Court of Appeals in Nichols v. Ann Arbor Federal Sav. & Loan Ass'n, 73 Mich. App. 163, 250 N.W. 2d 804 (Mich. 1977), and the Florida District Court of Appeal in First Federal Sav. & Loan Ass'n v. Lockwood, 385 So. 2d 156 (Fla. App. 1980), have all required the mortgagee to prove that its security was impaired by the transfer before it could enforce the due-on-sale clause.[4] Several courts have reached the opposite conclusion and have held that the mortgagee may enforce the due-on-sale clause in accordance with the contract terms even where the motive behind enforcement is economic enhancement and not protection of the security interest. See: Dunham v. Ware Savings Bank, 423 N.E. 2d 998 (Mass. 1981), Tierce v. APS Co., 382 So. 2d 485 (Ala. 1980), Malouff v. Midland Federal Sav. & Loan Ass'n, 509 P. 2d 1240 (Colo. 1973), Occidental Sav. & Loan Ass'n v. Venco Partnership, 293 N.W. 2d 843 (Neb. 1980), First Commercial Title, Inc. v. Holmes, 550 P. 2d 1271 (Nev. 1976), Century Federal Savs. & Loan Ass'n v. Van

---

4. See also Terry v. Born, 604 P. 2d 504 (1979), Baker v. Loves Park Sav. & Loan Ass'n, 333 N.E. 2d 1 (Ill. 1975), and State of New Mexico v. Valley Sav. & Loan, 636 P. 2d 279 (N.M. 1981).

Glahn, 364 A. 2d 558 (N.J. 1976),[5] Crockett v. First Federal Sav. & Loan Ass'n of Charlotte, 244 S.E. 2d 580 (N.C. 1976), Gunther v. White, 489 S.W. 2d 529 (Tenn. 1973), Sonny Arnold, Inc. v. Sentry Savings Ass'n, 615 S.W. 2d 333 (Tex. Civ. App. 1981), Lipps v. First American Service Corporation, _____ Va. _____ (Va. Sup. Ct. 1982).[6] Some courts have softened this position to a certain extent. The Ohio Supreme Court in Great Northern Savings Co. v. Ingarra, 423 N.W. 2d 128 (Ohio 1981), said: "Even those jurisdictions holding that 'due-on-sale' clauses are ordinarily enforceable have held that such enforcement is subject to equitable defenses such as estoppel and unconscionability."

At 131. See also: First Commercial Title, Inc. v. Holmes, 550 P. 2d 1271 (Nev. 1976), Holiday Acres No. 3 v. Midwest Federal Sav. & Loan Ass'n of Minneapolis, 308 N.W. 2d 471 (1981), Continental Federal Sav. & Loan Ass'n v. Fetter, 564 P. 2d 1013 (Okla. 1977) and Mutual Federal Sav. & Loan Ass'n v. American Medical Services, Inc., 223 N.W. 2d 921 (Wis. 1974).

Defendants cite the California Supreme Court case of Wellenkamp v. Bank of America, 148 Cal. Rptr. 379, 582 P. 2d 970 (1978). Both the majority opinion and the dissent in Wellenkamp have been the subject of vigorous discussion. The majority held that a due-on-sale clause in a residential mortgage instrument was an unreasonable restraint on alienation where the mortgagor's sale of the property did not not impair the lender's security and the lender's motive in foreclosing was to maintain its loan portfolio at current interest rates.

5. But see Fidelity Land Development Corp. v. Reider & Sons Bldg. & Development Co., 377 A. 2d 691 (N.J. 1977).

6. See also Chapman v. Ford, 227 A. 2d 26 (Md. 1967).

Following California case law the majority opinion weighed the justification for the restraint with the quantum of restraint, defined as "the actual practical effect upon alienation which would result from enforcement. . . . [T]he greater the quantum of restraint that results from enforcement of a given clause, the greater must be the justification for that enforcement." At 973. The court considered the issue in the context of a mortgagee agreeing to waive its right to foreclose in return for some negotiated higher rate of interest. The majority found that the mortgagee's desire to maintain its loan portfolio at current interest rates was an insufficient justification when balanced against the possibility that the buyer might insist upon a lower purchase price when faced with the mortgagor's demand for a higher interest rate. The court feared that "[t]he seller would then be forced to choose between lowering the purchase price and absorbing the loss with the resulting reduction in his equity interest, or refusing to go through with the sale at all. (Footnote omitted)." At 975. The due-on-sale clause was found to be invalid and unenforceable.

Justice Clark's dissent in Wellenkamp was based on two considerations. The first consideration was a distinction that had been grounded in California case law, before the majority destroyed it in Wellenkamp, between the situation where a mortgagor enters into an installment sale contract and the situation where a mortgagor sells his property outright: Tucker v. Lassen Sav. & Loan Ass'n., 116 Cal. Rptr. 633, 526 P. 2d 1169 (1974), and Coast Bank in La Sala v. American Sav. & Loan Ass'n., 97 Cal. Rptr. 489 P. 2d 1113 (1971). This distinction has no comparable history in Pennsylvania case law, and, although the argument for holding a due-on-sale

clause invalid is stronger in the situation involving the installment sale contract,[7] this court finds Justice Clark's position based on the second consideration, the policies behind upholding automatic enforcement, persuasive in either situation. An examination of these policies shows that there is no unreasonable restraint on alienation, even when the mortgagor has entered into an installment sale contract.

Justice Clark realized that the quantum of restraint as defined by the Wellenkamp majority "results not from exercise of the contractual clause but rather from the bleak and unpredictable economic conditions. . . . Of course, whenever money is tight and interest rates are high, a brake on those sales requiring financing naturally results. (Footnote omitted.)" At 978. Justice Clark is correct in recognizing at 979, that every buyer who seeks to purchase property financed by a mortgage loan will be adversely affected by these unfavorable economic conditions.

"If a loan exists on the property with a due-on clause, no *increased* restraint on selling results if the lender cannot accept the proposed buyer, the situation then being the same as in the case of the unavailability of funds to the proposed buyer. If the lender will permit assumption but only at an increased interest rate, again no *increased* restraint results because without the existing loan the buyer would be required to pay the higher interest rate

---

7. The mortgagor who sells his property pursuant to an installment sale contract retains an interest in continuing to maintain the property and so the mortgagee's security is less likely to be jeopardized. Further, the mortgagor who receives full payment pursuant to an outright sale is in a position to retire the loan when the due-on-sale clause is enforced and so the hardship to the seller is not as great.

and the seller may be required to compromise his selling price. There is thus no increased restraint on alienation beyond that inherent in the economic conditions postulated by the majority." General economic conditions may certainly inhibit the sale of property, but these conditions do not constitute a restraint on alienation.[8]

This court is concerned with what Justice Clark has identified as the real effect of denying the lender its contractual right to enforce a due-on-sale clause at 979:

"[I]n a tight money market, the seller of unencumbered real property is already seriously handicapped. However, if his neighbor's home possesses an existing loan with a now unenforceable due-on clause, that seller is granted an immediate competitive advantage. In spite of his original agreement, he can now 'sell' the loan without regard to the lender's wishes. His buyer has automatic financing where none is otherwise available. The interest he will be required to pay is less than market. Because that seller has a marketable, sought-after asset in the form of a low-interest transferable loan — something he never bargained for — he can ask for and expect to get additional considerations from his buyer. And the buyer may also look forward to the same advantage on resale. The loan has thus become not a restraint on alienation but a factor making salable what before could not be sold. (Footnote omitted.)" The mortgagor's competitive advantage over other sellers will also allow him to demand a higher selling price. The mortgagor who is given the right to sell his low interest rate, a right for

---

8. See Enforcement of Due-on-Transfer Clauses, 13 Real Prop. Prob. & Tr. J. 891 (1978).

which he did not contract, may well receive a higher purchase price for his property.[9] In an installment sale the mortgagor may receive an interest rate higher than the interest rate he pays to the original mortgagee, although lower than the current interest rate. In the case before us Trunk has in fact demanded a 12 percent interest rate of the Tierneys while he is paying off his loan to plaintiff at an interest rate of ten percent.

Far from constituting an unreasonable restraint on alienation, the due-on-sale clause may make acceptable to the original mortgagee a transaction which would not otherwise be attractive. Plaintiff contracted with Trunk for a ten percent interest rate on the initial loan and no doubt based this rate, at least in part, on the assumption that the due-on-sale clause would allow plaintiff to renegotiate the interest rate at some future date when the property changed hands. "[I]t is clear that lenders negotiate home loans with the realistic expectation that they will not be held to maturity, and interest rates are adjusted accordingly."

Dunham v. Ware Sav. Bank, 423 N.E. 2d 998, 1001 (Mass. 1981).[10] Without this assumption,

---

9. See Enforcement of Due-on-Transfer Clauses, 13 Real Prop. Prob. & Tr. J. 891 (1978), p. 916.

10. The majority opinion in Wellenkamp, supra, at 976, approves of the use of a variable interest rate mortgage as an "attractive and viable" alternative for lenders trying to protect themselves against rising interest rates when entering into a long term loan. The mortgagor will be affected by a variable interest rate mortgage as much as a due-on-sale clause in a mortgage. This is particularly true when, as here, the lender is apparently waiving its right to foreclose in exchange for renegotiation of the interest rate on all of its due-on-sale clause mortgages. (Deposition of Frederick C. Mosser, Vice President in charge of lending, New Home Federal Savings and Loan, p. 16.) See Enforcement of Due-on-Transfer Clauses, 13 Real Prop. Prob. & Tr. J. 891 (1978).

Trunk would not have been able to contract for a ten percent loan. The Texas Court of Civil Appeals in Crestview, Ltd. v. Foremost Insurance Company stated:

"[A due-on-sale clause] operates initially to facilitate, and not inhibit, the free alienation of real property and acts directly to serve the public policies relied upon to justify in the first instance the rule against unreasonable restraints. In contrast, if a 'due-on-sale clause' may lawfully operate only when the noteholder's security would be impaired, we should think that the result would be to deter sellers and lenders from committing themselves to long-term, deferred-payment arrangements with purchasers except at higher rates of interest, higher purchase prices, or higher initial cash payments, all of which would tend to discourage the sale and alienation of real property, thereby subverting the pertinent public policies sought to be served by the rule against unreasonable restraints." Third Supreme Judicial District of Texas, July 29, 1981, No. 13, 461.

This line of reasoning has led some courts to the conclusion that a due-on-sale clause is not a restraint on alienation at all, much less an unreasonable restraint on alienation. See: Williams v. First Fed. Sav. & Loan Ass'n, 651 F. 2d 910 (4th Cir. 1981) and Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 224 S.E. 2d 580 (1979). The Nebraska Supreme Court in Occidental Sav. & Loan Ass'n v. Venco Partnership, 206 Neb. 469, 471, 472, 293 N.W. 2d 843, 845 (1980), stated: An examination of the law pertaining to restraints on alienation makes it clear that a 'due-on-sale' clause is not a restraint on alienation and cannot be so considered for any purpose, theoretical or practical." We prefer, as did the Supreme Judicial Court of Mas-

sachusetts in Dunham v. Ware Sav. Bank, 423 N.E. 2d 998, 1001 (1981), "to rest our decision on the conclusion that even if [the due-on-sale clause] is such a restraint, its nature is such that it is enforceable."

The reasonableness of restraint is judged by the purpose sought to be obtained. Lenders must be able to compete with inflation and higher interest rates or they will not long remain viable as lending institutions. The due-on-sale clause is a proper subject of bargaining between a lender and a borrower. This court deems it a sound judicial principle not to take sides in a battle of economic forces: Redd v. Western Sav. & Loan Co., Opinion of Utah Supreme Ct., May 21, 1982, 50 L.W. 2727.

Finally, if the court were to decide that, under Pennsylvania law, a due-on-sale clause was unenforceable as an unreasonable restraint on alienation, Pennsylvania law would be inconsistent with Federal law. This court believes that Pennsylvania law would be preempted.[11] The doctrine of preemption stems from U.S. Const., Art. 6, cl. 2, the Supremacy Clause. The doctrine applies where Federal and State law are in direct conflict or where an enactment of Congress has so pervasively occupied an area of the law as to leave no room for State law. Federal regulations specifically authorize federally chartered institutions, such as plaintiff, to enforce the due-on-sale clause: 12 C.F.R. §545.8-3 (f) and (g) (1980), formerly 12 C.F.R. §545.6-11 (f) and (g) (1976). The Federal case law strongly indicates that the Federal regulations concerning the due-on-sale clause preempt conflicting state law: Bailey v. First Federal Sav. &

---

11. None of the parties addressed the issue of Federal preemption in their briefs or at oral argument.

Loan Ass'n of Ottawa, 467 F.Supp. 1139 (C.D. Ill. 1979), Williams v. First Fed. Sav. & Loan Ass'n, 651 F. 2d 910 (4th Cir. 1981), Dantus v. First Federal Sav. & Loan Ass'n of Denver, 502 F.Supp. 658 (D. Colo. 1980).[12]

## IV.

Lastly, Trunk claims that he is entitled to a jury determination of whether the due-on-sale clause constituted a contract of adhesion. Trunk points to the unequal bargaining power between himself and plaintiff, an institutional lender, and to the mortgage form,which is the FNMA/FHLMC Uniform Mortgage Instrument, used by plaintiff since 1975 and many institutional lenders. The court recognizes that these factors might tend to show that the provision was not actually bargained for, but these factors alone will not support Trunk's claim.

Trunk cites Kelmo Enterprises v. Commercial Un. Ins., 285 Pa. Superior Ct. 13, 426 A. 2d 680 (1981), and Hionis v. Northern Mutual Ins. Co., 230 Pa. Superior Ct. 511, 327 A. 2d 363 (1974). Both of these cases deal with exclusions in insurance policies. While the analogy Trunk wishes the court to draw is not completely implausible, this court is unwilling to expand the defense of adhe-

---

12. See also Great Western Union Federal Sav. & Loan v. Walters, (W.D. Wash., Case No. C-79-906V, June 18, 1980), rejecting the mortgagor's contention that Paragraph 15 of the Uniform Mortgage Instrument, which states that the "Mortgage shall be governed by the law of the jurisdiction in which the Property is located," requires the application of state law. Paragraph 15 was incorporated in the mortgage instrument between plaintiff and Trunk. Although this issue has never been raised by Trunk or the Tierneys and was not briefed or argued, the court would find the analysis of the Great Western decision persuasive.

sion to include a due-on-sale clause in a mortgage agreement. Our reluctance stems from the concerns expressed previously in the opinion, the policy arguments and the question of Federal preemption, and also from the nature of the claim in this particular instance. The specific facts as admitted in the pleadings and disclosed in the depositions in this mortgage transaction do not sustain the contention. Trunk, who has a Bachelor's Degree in English Education and a Master's Degree in Instructional Communication Deposition of Joseph Trunk, p. 7, admits that he read the mortgage agreement at the time of settlement: Deposition of Joseph Trunk, p. 28. Moreover, we do not find that Paragraph 17 in the mortgage is ambiguous or obscure.

### ORDER

And now, June 23, 1982, the motion for summary judgment pursuant to Pa.R.C.P. 1035 of plaintiff New Home Federal Savings and Loan Association is granted. The motion for summary judgment pursuant to Pa.R.C.P. 1035 of defendant Joseph A. Trunk is refused.

