KENNETH L. DUNHAM & others[1] vs. WARE SAVINGS BANK.[2]

Hampshire. April 8, 1981. — July 20, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & NOLAN, JJ.

*Mortgage*, Real estate, Due-on-sale clause. *Real Property*, Mortgage, Restraint on alienation.

A "due-on-sale" clause in a home mortgage, providing, at the option of the lender, for acceleration of the maturity of the loan upon alienation of the real property security, is reasonable, and thus enforceable, even if it constitutes a restraint on alienation. [65-75]

CIVIL ACTION commenced in the Superior Court Department on May 6, 1980.

The case was heard by *Griffin*, J., on a motion for summary judgment.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Alan R. Goodman* for the plaintiffs.

*William J. LeDoux* (*James E. Wallace, Jr., & John A. Mavricos* with him) for Ware Savings Bank.

*Henry B. Shepard, Carol Goodman, Thomas P. Storer & Raymond C. Zemlin*, for Savings Banks Association of Massachusetts & another, amici curiae, submitted a brief.

*John J. McCarthy & Stanley V. Ragalevsky*, for Massachusetts Co-operative Bank League, amicus curiae, submitted a brief.

---

[1] F. Janine Uzzell and Glenn Swenson.

[2] The plaintiffs' case against a second defendant, George A. Tetreault, Jr., remains undisturbed because Tetreault did not join in the bank's motion for summary judgment.

HENNESSEY, C.J.   The facts of this case are simple, but it will likely have significant impact upon many transactions involving the sale of real property.  We decide a question recently presented to a number of courts in the United States, namely, whether the enforcement of a so called "due-on-sale" clause[3] in a home mortgage constitutes an unreasonable restraint on alienation in the absence of allegations of impairment to the security.  A due-on-sale clause is a device commonly used in real property security transactions to provide, at the option of the lender, for acceleration of the maturity of the loan upon the alienation of the real property security.  We conclude that we need not decide whether such a clause is a restraint on alienation because we also conclude that if it is indeed a restraint on alienation, it is a reasonable restraint and therefore enforceable.

The parties here include borrowers (Kenneth L. Dunham and F. Janine Uzzell) who sold their mortgaged home to a buyer (Glenn Swenson) who attempted to assume the borrowers' low-interest mortgage, and include as well a bank (Ware Savings Bank) which threatened foreclosure unless the buyer renegotiated the mortgage and accepted the market interest rate.  When the buyer purported to assume the mortgage, the bank attempted to enforce, through foreclosure, the due-on-sale clause in the mortgage.[4]  The bor-

---

[3] This case does not involve either a "due-on-encumbrance" or a "consent-to-transfer" clause, two additional clauses familiarly found in such transactions.  See *Tucker* v. *Lassen Sav. & Loan Ass'n,* 12 Cal. 3d 629 (1974) (due-on-encumbrance clause not automatically enforceable against mortgagor who enters instalment contract for sale of the security); *Crockett* v. *First Fed. Sav. & Loan Ass'n,* 289 N.C. 620, 634, 642 (1976) (Lake, J., dissenting) (consent-to-transfer clause implies consent will not be unreasonably withheld by lender:  to enforce clause automatically is to make it "a loan shark's trap for the unwary borrower" and "sheer extortion").  We take no position regarding the latter two types of acceleration clause.

[4] The due-on-sale clause in the 1978 mortgage in the case at bar reads as follows:  "The Mortgagor also covenants and agrees that in the event the ownership of the mortgaged premises or any part thereof shall by the voluntary or involuntary act of the Mortgagor or by operation of law or otherwise become vested in any person, partnership, corporation, trust or

rower and the buyer then brought this action against the bank, seeking an injunction against the foreclosure, and a declaration that the due-on-sale clause in the mortgage was unenforceable as an unreasonable restraint on alienation. A judge of the Superior Court allowed the bank's motion for summary judgment, the plaintiffs appealed to the Appeals Court, and we transferred the case to this court on our own motion. We affirm.

Initially, we dispose of the plaintiffs' claim that the bank waived its right to accelerate because it did not seek to enforce the clause until approximately three months had elapsed since the transfer. The prevailing rule is that under an ordinary acceleration clause in a mortgage the obligee has a reasonable time after the event which gives rise to the right to accelerate in which to elect to declare the indebtedness due. *Malouff* v. *Midland Fed. Sav. & Loan Ass'n*, 181 Colo. 294, 304 (1973). We do not think that three months is unreasonable, see *id.* (one month reasonable, but not one year), although we note that once the bank knows or should have known of the transfer, any delay is at its peril. See note 12, *infra.*

We next examine the issue whether the due-on-sale clause is a restraint on alienation. There is substantial authority that it is not. "An examination of the law pertaining to restraints on alienation makes it clear that a 'due on sale' clause is not a restraint on alienation and cannot be so considered for any purpose, theoretical or practical." *Occidental Sav. & Loan Ass'n*, v. *Venco Partnership*, 206 Neb. 469, 471-472 (1980). "[I]ts effect is to remove a lien or encumbrance — namely the security deed of trust — and thereby render the parcel of land more alienable — not less. Moreover, and perhaps more importantly, the homeowner whose property is subject to a due-on-sale clause is as free to

association other than the Mortgagor, the entire mortgage debt then remaining unpaid shall, at the option of the Mortgagee, forthwith become due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of a subsequent alienation of title by the Mortgagor or successor in title."

sell, and, in selling, to realize as much as a homeowner holding the same property free and clear of any encumbrance. . . . It could hardly be seriously contended that, if a loan secured by a deed of trust to provide funds to purchase a house were, *from the outset* payable on demand, it would amount to an unreasonable restraint of alienation. So how can it be an unreasonable restraint of alienation for the loan to be payable on demand under some conditions (in case of sale), and payable at fixed period intervals under other conditions (in case of continued ownership and occupancy)? . . . The [borrowers] seek to convert an advantage obtained by them when they first borrowed to buy the house, which there was no legal obligation for the lender to provide, into an even greater advantage. What the [borrowers] argue is that, when they *acquired the property*, they should have been granted a better deal, allowing full rights to maintain the full 30 year term status of the loan, despite a change in the home ownership" (emphasis in original). *Williams* v. *First Fed. Sav. & Loan Ass'n*, 651 F.2d 910, 923-924 n.29 (4th Cir. 1981). See *Crockett* v. *First Fed. Sav. & Loan Ass'n*, 289 N.C. 620, 625 (1976) ("[T]he practical effect of the due-on-sale clause when it is considered in isolation is that the owner is encouraged not to alienate his property *if* it would be more advantageous to enjoy a loan which has become favorable because of changed interest rates in the market"); Note, Enforcement of Due-on-Transfer Clauses, 13 Real Prop., Prob. & Tr. J. 891, 926 (1978) ("To label the loss of a purported favorable economic position as a restraint on alienation is a misconception of that doctrine, which was not intended to provide profitability of alienation, but only the ability to alienate without penalty"). Contra, *Wellenkamp* v. *Bank of America*, 21 Cal. 3d 943 (1978).

We need not ponder further the question whether we are here dealing with a restraint on alienation, because we prefer to rest our decision on the conclusion that even if it is such a restraint, its nature is such that it is enforceable. As the plaintiffs acknowledge, even if the due-on-sale clause

were a restraint on alienation in the traditional sense, its enforcement must be granted if it is a reasonable restraint. See *Bowen* v. *Campbell*, 344 Mass. 24 (1962). See also *Roberts* v. *Jones*, 307 Mass. 504 (1940); *Eastman Marble Co.* v. *Vermont Marble Co.*, 236 Mass. 138 (1920). See generally Manning, The Development of Restraints on Alienation since Gray, 48 Harv. L. Rev. 373, 404-405 (1935); Restatement of Property §§ 404, 405 (1944). We therefore focus our attention on the reasonableness of the restraint imposed by the clause where, as in this case, there is no allegation that the transfer from borrower-seller to buyer has impaired the security for the mortgage debt.

Before examining the bases upon which our decision rests, we outline some aspects of home mortgage transactions from the lender's perspective.[5] At the outset, we note that the historic purpose of the due-on-sale clause was to protect the lender's security interest (*Holiday Acres No. 3* v. *Midwest Fed. Sav. & Loan Ass'n*, 308 N.W.2d 471, 480 [Minn. 1981]), but with the advent of inflationary increases in the cost of borrowing money the clause has been used to protect the lender against other risks involved in the long-term loans associated with home finance. "The interest rate fluctuation is evidently a, indeed *the*, principal underlying characteristic of home lending activities which leads lenders to insist on due-on-sale clauses" (emphasis in original). *Williams* v. *First Fed. Sav. & Loan Ass'n, supra* at 926, 927 n.36. Also it is important to note that although mortgage loans are generally written for terms of twenty-five to thirty-five years, the average homeowner does not remain in one residence until his mortgage is repaid. In fact, figures submitted by amici curiae tend to establish that mortgages originating in the 1960's remained outstanding on the average from 6.5 to 9.8 years, depending on the year of origination. In 1980 the Federal National Mortgage Association bought thirty year

---

[5] This summary is compiled from information submitted by amici curiae, Savings Banks Association of Massachusetts, and the Massachusetts Mortgage Bankers Association.

mortgages at a yield based on a payoff within a twelve year period.

Whatever the precise numbers, it is clear that lenders negotiate home loans with the realistic expectation that they will not be held to maturity, and interest rates are adjusted accordingly. The device used to activate the "early" (actually *anticipated*) payoff before maturity is the due-on-sale clause, which reduces interest rate risk by reducing the average time over which a mortgage loan is outstanding. Invalidating the due-on-sale clause would in effect extend the life of the average mortgage loan perhaps two or three times longer than the lender had originally anticipated, intensifying the lender's risk of interest rate loss. It is fair to conclude that because of the reduced risk, use of an acceleration device *lowers* the interest rate at which the bank is willing to loan money. Viewed from this perspective, it can be argued that the mortgagors have already had the benefit of the clause which they now seek to invalidate.

Within the above context we turn to the policies which, on balance, make the clause reasonable and thus enforceable. They are: (1) the clause represents an equitable adjustment of rights between borrower and lender, (2) it may prevent State-chartered banks from operating at a competitive disadvantage with federally-chartered banks, and (3) it is a substantial benefit to the bank's depositors and to the future borrowers from the bank.

1. *The Clause Represents an Equitable Adjustment of Rights Between Lender and Borrower.*

Many of the courts which have upheld the use of due-on-sale clauses have relied on the theory that the bank's right to accelerate the outstanding debt upon sale of the property (and the concomitant right to obtain current interest rates by relending the money) is the counterpart of the borrower's right to prepay the loan without penalty. These courts have reasoned that the borrower's ability to "profit" from falling interest rates,[6] supported a like ability on the part of the

---

[6] In Massachusetts the Legislature has allocated this right to the borrower by statute. General Laws c. 183, § 56, allows certain borrowers to prepay a first mortgage without penalty at any time after three years from

lender to take advantage of interest rates in his favor. See, e.g., *Crockett* v. *First Fed. Sav. & Loan Ass'n*, 289 N.C. 620, 627 (1976); *Century Fed. Sav. & Loan Ass'n* v. *Van Glahn*, 144 N.J. Super. 48, 54 (1976). *Crockett, supra*, suggested that, "[i]n fact, a fair contractual agreement would appear to support a loan with no prepayment penalty and a due-on-sale clause. The immediate buyer has the security of having the ability to pay off his loan at no greater than the initial interest rate, and he can get a more favorable loan if interest rates decline. The lender can get a more favorable loan agreement if interest rates rise and there is a new owner of the realty." While we note that the right of the borrower to take advantage of falling interest rates is not equal in value to the bank's acceleration rights during periods of sustained, steady inflation, the right to prepay is always of some value. See *Peter Fuller Enterprises* v. *Manchester Sav. Bank*, 102 N.H. 117 (1959). Since we cannot predict the future, we do not know the value of the borrower's prepayment rights next month, next year, or ten years from now. We do determine, however, that equity speaks in favor of enforcing the bank's rights under its due-on-sale clause when the borrower has the prepayment rights established by G. L. c. 183, § 56.

2. *Federal Preemption.*

Another problem which might occur if due-on-sale clauses were invalidated would be inconsistent enforcement of the clause depending on whether the lender is a State or federally-chartered institution. Federal law governing mortgage loans by federally-chartered institutions appears to require enforcement of due-on-sale clauses. "[A Federal savings and loan] association continues to have the power to include, as a matter of contract between it and the borrower, a [due-on-sale clause] . . . . [E]xercise . . . of such option . . . shall be exclusively governed by the terms of the loan contract . . . ." 12 C.F.R. § 545.8-3(f) (1980). The

---

the date of the note, and penalties for earlier prepayment are substantially limited.

comptroller of the currency has proposed a similar rule for national banks issuing variable rate mortgages. 45 Fed. Reg. 64,196, 64,205 § 29.7 (1980). Recently, the Federal National Mortgage Association[7] has adopted an explicit policy requiring either an enforceable due-on-sale clause or an "early-call"[8] provision permitting the lender to require full payment after seven years, whether the property is sold or not. Wall Street Journal, Oct. 24, 1980, at 15, col. 2.

There is recent Federal case law which offers substantial support for the proposition that Federal regulations permitting due-on-sale clauses prevail as to federally-chartered institutions, even in the presence of conflicting State law. *Conference of Fed. Sav. & Loan Ass'ns* v. *Stein,* 495 F. Supp. 12 (E.D. Cal.), aff'd, 604 F.2d 1256 (9th Cir. 1979), aff'd mem., 445 U.S. 921 (1980). *Bailey* v. *First Fed. Sav. & Loan Ass'n,* 467 F. Supp. 1139 (C.D. Ill. 1979). *Glendale Fed. Sav. & Loan Ass'n* v. *Fox,* 459 F. Supp. 903 (C.D. Cal. 1978). See *Williams* v. *First Fed. Sav. & Loan Ass'n,* 651 F.2d 910, 914 n.6 (4th Cir. 1981) (suggesting that there is "a nationwide federal policy favoring due-on-sale clauses"). Cf. *First Fed. Sav. & Loan Ass'n* v. *Greenwald,* 591 F.2d 417 (1st Cir. 1979); *Meyers* v. *Beverly Hills Fed. Sav. & Loan Ass'n,* 499 F.2d 1145 (9th Cir. 1974). State-chartered lenders in States which refuse to enforce due-on-sale clauses are thus in a particularly difficult situation. The State-chartered institution is denied the opportunity to agree with the borrower on a due-on-sale clause. The likely result will be that these institutions will quote higher interest rates in recognition of the additional risk, utilize

---

[7] The Federal National Mortgage Association (FNMA) is a government-chartered secondary mortgage corporation which buys residential mortgages from originating lenders at prices and upon terms that are set in advance. After obtaining a commitment from FNMA to purchase mortgages conforming to FNMA requirements, a bank can loan money to its customers who need mortgage financing even though the bank has no money of its own to lend. See A. Axelrod, C. Berger & Q. Johnstone, Land Transfer and Finance 91 (1978).

[8] Acceleration of the mortgage debt is designated a "call" if initiated by the lender, and "prepayment" if brought about by the borrower.

early-call provisions to accelerate predictably the debt at the lender's option (thus forcing renegotiation consistent with current interest rates), or rely on variable rate mortgages — an option only recently permitted in Massachusetts.[9] Moreover, the State-chartered institution might not be able to use the standard mortgage instrument required in the secondary market and thus would not have access to an important source of mortgage funds. As the court in *Williams* v. *First Fed. Sav. & Loan Ass'n, supra* at 930-931 n.48, presented the issue: "One can only wonder where it leaves the jurisprudence of California with its state court decision, *Wellenkamp* v. *Bank of America,* 21 Cal. 3d 943 . . . (1978), decided August 25, 1978, essentially voiding due-on-sale clauses for state lending institutions speedily followed on November 1, 1978, by *Glendale Federal Savings and Loan Association* v. *Fox,* 459 F. Supp. 903 (C.D. Cal. 1978), which held valid due-on-sale clauses in lending documents of federal associations. The state can hardly relish the competitive disadvantage inexorably following for state lending associations."

3. *The Clause Protects the Bank's Depositors and Benefits Future Borrowers.*

The third base upon which we rest our decision is that the clause is of substantial benefit to both future borrowers from the bank and to the bank's depositors. At first blush, the problem presented today appears to involve only the actual parties. A hasty reading leaves the simplistic impression that this case presents the classic confrontation between an institutional lender and a borrower, the borrower representing the stereotypical consumer resisting the foreclosure advances of the bank. The bank prevails. That, however, is a narrow and misleading interpretation. This court has not hesitated to use its power to prevent oppression and overreaching, when that power could be fairly exercised so as not to become itself an instrument of injustice. The result we reach today is consistent with our historic principles.

---

[9] G. L. c. 167, § 70, inserted by St. 1980, c. 335, § 1. See note 11, *infra.*

Only on the most basic levels is this a struggle between the bank and the borrower to determine who will "profit" from inflation. See *Holiday Acres No. 3* v. *Midwest Fed. Sav. & Loan Ass'n*, 308 N.W.2d 471, 481-482 (Minn. 1981)("The allocation of the potential profit or loss generated by the existence of a low-interest loan in a high-interest mortgage market forms the basis of this dispute"); *Century Fed. Sav. & Loan Ass'n* v. *Van Glahn*, 144 N.J. Super. 48, 55 (1976) ("The issue here is who will reap the profit"). While the parties here assert their individual interests, they represent in a larger sense other social groups who stand to benefit from our decision.

The contest surely involves the adverse interests of past borrowers and future borrowers. Elimination of the clause "will cause widespread hardship to the general home-buying public." Federal Home Loan Bank Bd. Adv. Op. No. 75.647, at 37 (July 30, 1975). Invalidation of the due-on-sale clause would have an immediate, concrete, and unfair impact upon the interests of future borrowers because the interest rate for their mortgage loans would have to be sufficiently high to offset the bank's loss from outstanding low-interest loans which could then be prolonged through assumption. Viewed from this perspective, the issue thus becomes whether future borrowers who borrow from the bank *through assumption of outstanding low-interest mortgages* should be entitled to subsidization by those future borrowers who borrow *directly* from the bank. We perceive no policy reason for imposing such a result. "In the final analysis, one must conclude that people [who wish to assume low-interest mortgages in a high-interest market] are simply too eager to shift to others burdens properly belonging on their own shoulders." *Williams, supra* at 916.[10]

---

[10] Other recent cases indicate the same concern. In *Mutual Fed. Sav. & Loan Ass'n* v. *Wisconsin Wire Works*, 71 Wis. 2d 531, 539 (1976), the court stated: "Obviously it was costing Mutual more to obtain the funds it made available for borrowing. Mutual would reap no real windfall; on the contrary Mutual might be required to charge the current borrowers more to make up the deficiency resulting from the past transaction." Jus-

The controversy can also be viewed as a conflict between the borrower-seller and the bank's depositors. Massachusetts savings banks, cooperative banks, and credit unions are nonprofit corporations organized for mutual benefit. See generally G. L. c. 168 (savings banks), c. 170 (cooperative banks), c. 171 (credit unions). The same is true of federally-chartered savings and loan associations. 12 U.S.C. § 1464 (1976 & Supp. III 1979). The capital of these institutions comes from accumulated surplus of prior years' operations, which is held in reserve for the benefit of the depositors. See G. L. c. 168, §§ 57, 59, 60, 60A; G. L. c. 170, §§ 37, 37A, 38, 40; G. L. c. 171, §§ 19-20. In a sense a savings bank is the alter ego of its depositors, and the risks faced by the institution expose all the depositors to potential harm. To the extent that yields on the investments of the institutions are reduced to unprofitable levels, the loss is borne by the individual depositor in the form of reduced returns on savings. "Calling a loan in order to get the full benefit of current interest rates is a legitimate and reasonable business practice — one which protects the Association members and their savings investments as well as fulfilling the statutory purpose of the association." *Century Fed. Sav. & Loan Ass'n, supra* at 54.

4. *Conclusion.*

Although the question we decide today is a proper subject for judicial determination, the competing policies at issue in this case make it ideally suited to legislative resolution.[11] As

---

tice Clark, dissenting in *Wellenkamp* v. *Bank of America*, 21 Cal. 3d 943 (1978), wherein the majority invalidated automatic enforcement of due-on-sale clauses in order to protect borrowers, stated: "[O]ur beneficence may be shortsighted. For in attempting to assist the Wellenkamps, the majority opinion must necessarily restrict if not dry up mortgage funds otherwise available to the next generation of borrowers." *Id.* at 954.

[11] The Legislature has already addressed similar policy issues in its recent approval of variable rate mortgages, which, in practical effect, allocate gain from increased interest rates to the lender and the benefits of decreased interest rates to the borrower. G. L. c. 167, § 70. Variable rate mortgages, although different in detail, share some general restrictions with fixed rate mortgages containing prepayment and due-on-sale

we have demonstrated, there is ample support for allocation of inflationary gains to any of a number of groups — depositors, mortgagors holding outstanding low-interest mortgages, or future borrowers who must borrow to finance the purchase of a home. In the circumstances presented, if the bank is to be forbidden from enforcing a contract which allocates the gain to itself, it must be shown that the contract unreasonably restrains alienation. This has not been established, and so the contract is enforceable.[12]

In the present economic circumstances, the visibility of large institutional lenders often makes such institutions the focal point for community concern. The right of the lender to accelerate a mortgage debt in order to renegotiate the loan at market interest rates will only be utilized by lenders when interest rates have risen. However, this coincidence should not obscure the fact that inflation has many causes, and the right to enforce a due-on-sale clause no more causes rising interest rates than the exercise of a borrower's right to prepay his loan causes declining interest rates, or the carrying of an umbrella causes inclement weather. Both the right to prepay and the right to accelerate upon sale are protective devices relied upon by the community to moderate gains and losses in an uncertain economy. Because the due-

---

clauses, in that variable rate mortgages are limited in the amount and frequency of interest rate changes. Variable rate mortgages are but one legislative response to the problems encountered by borrowers and lenders alike in an unpredictable economy. See Va. Code § 6.1-330.34 (1978) (requiring prominent disclosure of due-on-sale clauses); Minn. Stat. § 47.20, subdivision 6 (1980) (invalidating the use of due-on-sale clauses in most residential housing). But see *Holiday Acres No. 3* v. *Midwest Fed. Sav. & Loan Ass'n,* 308 N.W.2d 471 (Minn. 1981) (enforcing due-on-sale clause when subject property is investment residential property).

[12] In the case at bar, there are no allegations of fraudulent or unconscionable conduct by the bank, or laches, which might give rise to equitable defenses to be used by a borrower in such a situation. See *Crockett* v. *First Fed. Sav. & Loan Ass'n,* 289 N.C. 620, 630-631 (1976); *Tucker* v. *Pulaski Fed. Sav. & Loan Ass'n,* 252 Ark. 849, 853 (1972). Cf. *First Fed. Sav. & Loan Ass'n* v. *Lockwood,* 385 So. 2d 156, 160 (Fla. Dist. Ct. App. 1980).

on-sale clause is counterbalanced by the borrower's statu-
tory right to prepay; because federally-chartered institu-
tions might continue to enforce it as matter of Federal
regulation irrespective of State court holdings; and because
the clause offers substantial benefits to depositors and future
borrowers, we conclude that if the clause does restrain
alienation it does not do so unreasonably.

The judgment is affirmed.

*So ordered.*