14 Mass. App. Ct. 383 (1982)
440 N.E.2d 22
KATHERINE A. EGBERT & another,[1] trustees,
vs.
FREEDOM FEDERAL SAVINGS AND LOAN ASSOCIATION.
Appeals Court of Massachusetts, Suffolk.
May 13, 1982.
September 10, 1982.
Present: PERRETTA, DREBEN, & KASS, JJ.
*384 William Guy Ferris for the defendant.
Edward J. Barshak (Stuart R. Johnson with him) for the plaintiffs.
PERRETTA, J.
When the defendant mortgagee Freedom Federal Savings and Loan Association (Freedom) discovered that the plaintiff mortgagor trustees had granted a second mortgage on the realty in issue to Citicorp Real Estate, Inc. (Citicorp), in violation of what Freedom believed its rights to be under the terms of its mortgage, it exercised its option to accelerate the debt. Upon receiving notice that Freedom was electing to accelerate, the trustees obtained a discharge of the second mortgage from Citicorp and tendered the usual monthly payment.[2] Freedom declined to accept the payment and notified the trustees that it had commenced an action in the Land Court incident to foreclosure proceedings. The trustees then brought the present action in the Superior Court seeking injunctive relief against the foreclosure. The judge granted a preliminary injunction, restraining Freedom from exercising its rights as a mortgagee after default. Freedom appeals pursuant to G.L.c. 231, § 118, second par. We hold that, on the record before us, injunctive relief was not warranted.
1. The Facts.
We recite the undisputed facts as they appear in the complaint, the parties' exhibits, and an affidavit filed by Freedom's senior vice-president. In 1971, the trustees granted Freedom a mortgage securing a debt in the amount of $5,400,000. Interest was set at eight and one-half percent, per annum, until August 1, 1979, after which the interest became variable.[3] The proceeds of the loan were used to *385 construct an apartment complex which presently has a fair market value "far in excess of the balance due on the first mortgage."
Paragraph 8 of the mortgage provides, in pertinent part:
"That in the event of any change in, or relinquishment of, the Mortgagor's present legal or equitable rights, title or interest in the mortgaged premises in any manner or to any extent whatsoever by its own act or by the acts of any other parties other than by eminent domain or other governmental action or by liens, attachments or other claims not reduced to final judgment, then and in any such event the Mortgagee, at any time thereafter, may at its option and without notice declare the entire debt due and payable on demand, however the failure to exercise such option in any one instance shall not constitute a waiver of the right to exercise the same in the event of a subsequent change or relinquishment."
The mortgage was given upon the statutory condition and the mortgagee has the statutory power of sale. The mortgage makes no provision for notice of default or a right to cure a default so as to protect the borrower from acceleration of the mortgage note and foreclosure proceedings. See, e.g., Uniform Land Transactions Act, 13 U.L.A. § 3-512 (1977).
The trustees wrote to Freedom in 1974 concerning a proposed junior mortgage to The First National Bank of Boston and the "broadly worded" paragraph 8, stating: "In view of the breadth of this language we felt it would be sound judgment to obtain the consent of [Freedom] to the creation of the mortgage, albeit junior to the mortgage held by [Freedom]." Freedom assented to the mortgage in a document labeled "Waiver And Consent To Mortgage" which recited that Freedom "hereby WAIVES in this instance only the right to declare the mortgage debt due and payable on demand as provided in paragraph 8 of said Mortgage."
*386 Five years later the trustees again decided to give a junior mortgage, and on December 12, 1979, they wrote to Freedom explaining that a line of credit was being obtained from Citicorp in exchange for a junior mortgage on the trust property in the amount of $1,000,000. This mortgage would also secure certain preexisting notes to Citicorp. In that connection Citicorp was requesting an estoppel certificate from Freedom acknowledging that "no defaults currently exist" and certifying that Freedom would notify Citicorp if a default should occur and give Citicorp the opportunity to cure. In their letter, the trustees made reference to a recent conversation with an employee in Freedom's mortgage department who was of the opinion that the proposed mortgage to Citicorp required Freedom's assent. The trustees wrote: "Without becoming embroiled in that issue and consistent with our desire to keep you informed and involved, we are respectively [sic] requesting your assistance in the issuance of the estoppel certificate." In furtherance of their request, the trustees pointed out that the mortgagor's equity in the property "remains substantial," that Citicorp would also be interested in their faithful performance of the obligations under the first mortgage, and that the 1974 junior mortgage had been discharged.
Freedom's swift written response of December 14, 1979, was an emphatic refusal to assent to the granting of the mortgage to Citicorp: "Our position is that we made a twenty-five year loan at 8 1/2% interest per year secured by a first mortgage which requires, among other things, our assent to the creation of any liens secondary to our interest. For business reasons, we do not intend to assent in this instance without consideration. Furthermore, assuming we could reach agreement with you concerning such consideration, we could not agree to execute an estoppel certificate similar to the one enclosed with your letter. It is not in our best interests, (a) to assume the additional liability of informing the second mortgagee of a default, and (b) to in *387 essence preclude our option of accelerating the indebtedness and foreclosing in the event of a default."[4]
It was not until some fourteen months later that Freedom discovered that the trustees had granted the second mortgage to Citicorp on December 17, 1979. On March 28, 1981, Freedom wrote to the trustees stating that it "hereby exercises its option to declare the entire debt due and payable on demand." By letter dated March 31, 1981, the trustees informed Freedom that they were "astonished" by Freedom's position, that in their view the attempt to accelerate the loan was "without legal merit," and that "[t]he language in the mortgage ... neither prohibits the placement of a junior mortgage ... nor was it ever intended to have that effect." On April 13, 1981, the trustees advised Freedom that while they regarded its actions as "frivolous and entirely without merit," they had discharged the second mortgage in the "interest of good relations." Because Freedom would have no part of the trustees' conciliatory actions, the trustees sought protection by injunctive relief.
2. Availability of Money Damages as Precluding Injunctive Relief.
We need not repeat the standards for issuing preliminary injunctions. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609 (1980). It is our function "to decide whether the [trial] court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions." Id. at 615, quoting from Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222, 229 (1st Cir.1976).
As an initial matter, Freedom argues that injunctive relief is unavailable here because the allegations of wrongdoing, if proved, can be remedied by monetary damages at the time of a final judgment. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. at 617 n. 11 ("In the context of a preliminary injunction *388 the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity"). A mortgage foreclosure involves far more than the bare necessity to borrow money. In these circumstances, the availability of money damages is properly considered in evaluating "the irreparability of the harm." Westinghouse Bdcst. Co. v. New England Patriots Football Club, Inc., 10 Mass. App. Ct. 70, 72 (1980). Before undertaking that evaluation, "we must first `appraise the likelihood that various views of the facts and the law will prevail at trial.'" Ibid., quoting from Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv. L. Rev. 525, 541 (1978). No testimony was heard by the trial judge, and there are no competing affidavits from the parties. We draw our own conclusions from the documentary evidence. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. at 616. Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 26, 28 (1981).
3. The Scope of Paragraph 8.
The trustees make no argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), that the junior mortgage to Citicorp was beyond the reach of the language of paragraph 8, and we suspect that this is because there is little, if any, support for that position.[5] They argue only that the clause does not "explicitly" refer to junior or second mortgages. While paragraph 8 makes no express mention of junior or second mortgages, we conclude that subsequent mortgages are within the contemplation of the broad language of that clause. Paragraph 8 provides that "any change in ... the [m]ortgagor's present legal ... title or interest" triggers the option to accelerate the loan. "A mortgage of real estate is a conveyance of the title or of *389 some interest therein defeasible upon the payment of money or the performance of some other condition." Perry v. Miller, 330 Mass. 261, 263 (1953). See Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 747 (1980); Atlantic Sav. Bank v. Metropolitan Bank & Trust Co., 9 Mass. App. Ct. 286, 288 (1980). Although a mortgage generally is given for security purposes, the common law doctrine of mortgages prevails in Massachusetts. "[T]he mortgagor has merely an equity of redemption accompanied by a right to possession. The paramount title is in the mortgagee." Milton Sav. Bank v. United States, 345 Mass. 302, 305 (1963). See generally Park, Real Estate Law § 441 (2d ed. 1981).
4. Waiver of the Right to Accelerate.
The trustees contend that Freedom lost whatever right it might have had to accelerate by its failure to exercise that right within a reasonable time after it knew of the grant of the mortgage to Citicorp. See Dunham v. Ware Sav. Bank, 384 Mass. 63, 65 (1981) ("The prevailing rule is that under an ordinary acceleration clause in a mortgage the obligee has a reasonable time after the event which gives rise to the right to accelerate in which to elect to declare the indebtedness due. Malouff v. Midland Fed. Sav. & Loan Ass'n, 181 Colo. 294, 304 [1973]").[6] The trustees never informed Freedom that they had granted Citicorp a mortgage, but they contend that Freedom should nonetheless have known of this fact by reason of their December 12, 1979, letter requesting an estoppel certificate and identifying December 17, 1979, as the scheduled closing date. As we understand their argument, the trustees claim that Freedom's failure to act prior to March, 1981, while having implied knowledge of the grant, constitutes a waiver of the right to accelerate.[7] Freedom did not have actual knowledge of the second mortgage *390 by reason of the trustees' letter, and that letter, in view of its nature and purpose, is insufficient as matter of law to give rise to a duty by Freedom to inquire whether the trustees in fact granted the second mortgage, especially in light of Freedom's negative response of December 14, 1979. Cf. Crane Co. v. Park Constr. Co., 356 Mass. 13, 17 (1969).
The trustees also seek to construct a waiver claim on the basis of "cure," notwithstanding the absence of such a provision in the mortgage. They argue that Freedom failed to show that it declined the monthly mortgage payments in February and March of 1981, subsequent to its admitted actual knowledge of the second mortgage and prior to its election to accelerate. The very purpose, however, of paragraph 8 is to provide for optional acceleration because of specified nondebt related defaults. The effects of an election under that clause can be avoided "only by tendering prior to foreclosure the full accelerated mortgage debt." Osborne, Nelson & Whitman, Real Estate Finance Law § 7.6, at 437 (1979). A cure in the present instance could come only from securing a discharge of the second mortgage. Whether the trustees have the right to assert a cure must be considered not in respect to waiver but in relation to the validity of paragraph 8 in the first instance. Id. at § 5.21. See Enforcement of Due-on-Transfer Clauses, 13 Real Prop., Prob. & Tr. J. 891, 892-903 (1978). We thus reach the question left open in Dunham v. Ware Sav. Bank, 384 Mass. at 64 n. 3, that is, whether the enforcement of a due-on-encumbrance clause constitutes an unreasonable restraint on alienation.
5. Due-On-Encumbrance.
Unlike Dunham, which upheld the validity of automatic enforcement of a "due-on-sale" clause in a residential mortgage, we are concerned with a "due-on-encumbrance" clause in a commercial mortgage. "The cases and the literature *391 in this area of the law generally refer to acceleration clauses triggered by sale or encumbrance according to the particular triggering event involved in the case in question. Thus, even though a clause may permit acceleration either upon sale or upon encumbrance, it is normally referred to as a `due-on-sale' clause when the particular case involves sale and a `due-on-encumbrance' clause when the case involves encumbrance" (emphasis original). Tucker v. Lassen Sav. & Loan Assn., 12 Cal.3d 629, 631 n. 1 (1974).
In upholding the "due-on-sale" clause, the Dunham court noted that "Federal law governing mortgage loans by federally-chartered institutions appears to require enforcement of due-on-sale clauses" by reason of 12 C.F.R. § 545.8-3(f) (1981).[8]Dunham v. Ware Sav. Bank, 384 Mass. at 69-70. That regulation provides in relevant part:
"[A Federal savings and loan] association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. Except as [otherwise] provided in ... this section ..., exercise by the association of such option (hereafter called a due-on-sale clause) shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract."[9]
*392 In LaSala v. American Sav. & Loan Assn., 5 Cal.3d 864 (1971), it was held that a lender could not exercise the power of automatic enforcement of a "due-on" clause upon the further encumbering of the property; rather, the acceleration clause could be used only when enforcement was necessary for the protection of the lender's security. The requirement for such justification was extended to "due-on-sale" clauses "wherein legal title (and usually possession) is transferred" in Wellenkamp v. Bank of America, 21 Cal.3d 943, 950, 953 (1978). The California court reasoned that "a restraint on alienation cannot be found reasonable merely because it is commercially beneficial to the restrainor." LaSala v. American Sav. & Loan Assn., 5 Cal.3d at 880-881 n. 17. Wellenkamp v. Bank of America, 21 Cal.3d at 948-953.
Whether California could place such a condition on the exercise of a "due-on-sale" clause was recently considered in Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141 (1982). The Court concluded that "the [Federal Home Loan Bank] Board's due-on-sale regulation was meant to pre-empt conflicting state limitations on the due-on-sale practices of federal savings and loans, and that the California Supreme Court's decision in Wellenkamp creates such a conflict." Id. at 159. Additionally, the Court found § 545.8-3(f) to be consistent with the purposes of the Home Owner's Loan Act of 1933, 48 Stat. 128, as amended, 12 U.S.C. § 1461 et seq. (1976 & Supp. IV). "The Board has determined that due-on-sale clauses are `a valuable and often an indispensable source of protection for the financial soundness of Federal associations and for their continued ability to fund new home loan commitments.' 12 [C.F.R.] § 556.9(f)(1) (1982)." Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, supra at 168.
Because the interest rate function (see note 10, infra) of a "due-on-sale" clause provides reasonable justification for automatic enforcement of such a provision, id.; Dunham v. Ware Sav. Bank, 384 Mass. at 71-73, we must next consider whether § 545.8-3(f), which applies to a sale or transfer of *393 "all or any part of the real property securing the loan," embraces a "due-on-encumbrance" clause in a commercial mortgage. We are of the opinion that it does.
On a first reading it might be tempting to interpret § 545.8-3(f) as comprehending only those sales or transfers which involve possession as well as title. However, we think such a construction is precluded by 12 C.F.R. § 545.8-3(g) (1981), which provides, in relevant part: "With respect to any loan made after July 31, 1976, on the security of a home occupied or to be occupied by the borrower, a Federal association: (1) Shall not exercise a due-on-sale clause because of (i) creation of a lien or other encumbrance subordinate to the association's security instrument." See also 12 C.F.R. § 556.9(c) (1981). Thus, while § 545.8-3(f) provides that exercise of a due-on-sale clause "shall be exclusively governed by the terms of the loan contract," § 545.8-3(g) imposes certain limitations on residential mortgage loans made after July 31, 1976. Unless § 545.8-3(f) is read as including a due-on-encumbrance clause, § 545.8-3(g)(1)(i) is surplusage. We cannot construe the regulation in a manner which would render portions of it meaningless, and we conclude that, as used in § 545.8-3(f), the term "due-on-sale" must be read to permit acceleration either upon sale or encumbrance. This conclusion and Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141 (1982), preclude us from considering whether paragraph 8 is unconscionable per se and an unenforceable forfeiture, see Howard D. Johnson Co. v. Madigan, 361 Mass. 454, 458-459 (1972), as claimed by the trustees.[10]
*394 Even if our consideration were not preempted by § 545.8-3(f), we nonetheless would not grant the trustees relief against the option of paragraph 8. "We stress again that, in the absence of statutory restrictions, the rights of the parties to secured transactions are controlled by the agreement between them." Mechanics Natl. Bank v. Killeen, 377 Mass. 100, 108 (1979). Although "an equity court has power in appropriate cases to relieve against the forfeiture or penalty," Nelson v. Sanderson, 285 Mass. 583, 588 (1934), this is not an appropriate case. "We will not prohibit the exercise of a mortgage contract due-on-sale clause when the contract concerns investment residential property and no inequities in the bargaining of the contract are proved. We will apply, in all due-on-sale cases, traditional rules of equity and law. Here, the contract was negotiated by experienced business people, and there are no allegations of improper conduct, fraud, duress, coercion, or overreaching." Holiday Acres No. 3 v. Midwest Fed. Sav. & Loan Assn., 308 N.W.2d 471, 484 (Minn. 1981). See also Uniform Land Transactions Act, 13 U.L.A. § 1-311 (1977). Compare Howard D. Johnson Co. v. Madigan, 361 Mass. at 458 ("where the covenant broken required the submission of gross sales figures in order to fix a percentage rental, we think that the covenant broken is ancillary to the covenant to pay rent...").
6. Irreparable Harm.
"[W]e assess the probable harm to each party stemming from the preliminary resolution of the merits of the case. Having done this, our task is to choose the alternative that will inflict the least probable irreparable harm." Westinghouse Bdcst. Co. v. New England Patriots Football Club, Inc., 10 Mass. App. Ct. at 72.
Freedom argues that the only harm to the trustees in denying an injunction would be economic harm. It maintains that the trustees can afford to secure financing from another source, as demonstrated by a document that they submitted to the trial judge showing rental operations, cash flow and equity, 1974 through 1980, and the budget for *395 1981. The granting of the injunction, Freedom continues, works "an equal economic loss [for Freedom] ..., by the deprivation of the benefits in present return that would result from plaintiffs' repaying the borrowed funds." By granting the injunction, the trial judge implicitly found, as matter of fact, that the harm to the trustees if the injunction were denied outweighed the harm to Freedom if it were granted.
It follows from what we have said, however, that based upon the present record there does not exist a substantial possibility that the trustees will prevail on the merits. "[I]f the moving party can demonstrate both that the requested relief is necessary to prevent irreparable harm to it and that granting the injunction poses no substantial risk of such harm to the opposing party, a substantial possibility of success on the merits warrants issuing the injunction." Packaging Indus. Group. Inc. v. Cheney, 380 Mass. at 617 n. 12. Thus, while the trustees may have met their burden of demonstrating irreparable harm in the absence of injunctive relief, they have failed on this record to show a likelihood that they will prevail on the merits.
Our decision does not preclude further consideration of the case on the merits in the context of a full trial. See Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. at 28. Should the trustees prevail on any equitable defenses which they might have, but which they have failed to demonstrate on this record, see, e.g., Dunham v. Ware Sav. Bank, 384 Mass. at 74 n. 12, they will be entitled to damages. However, they are not at this time entitled to injunctive relief.
Accordingly, the injunction is vacated.
So ordered.
NOTES
[1] James M. Hurley, in their capacities as trustees of a trust known as Windsor at Westborough, Massachusetts, a three-hundred unit apartment complex developed and managed by the trust at all times here material.
[2] The trustees had timely paid, and Freedom had accepted, the usual monthly mortgage payments during the months between the date when the second mortgage was given to Citicorp and the date upon which Freedom discovered it.
[3] The interest was to be three and one-quarter percentage points above Freedom's announced interest rate payable on its regular savings accounts, but not higher than ten percent nor lower than eight and one-half percent, per annum.
[4] Although Freedom did not elaborate upon its "business reasons," we think them to be obvious in view of the fact that by 1979 interest rates were in steep ascent.
[5] Other than the conclusory statement made by the trustees in their letter of March 31, 1981, that paragraph 8 was never intended to prohibit junior mortgages, the trustees have not asserted any ambiguity or circumstance that would require or justify going beyond the mortgage. Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. at 27. Thomas v. Christensen, 12 Mass. App. Ct. 169, 175 (1981).
[6] The Malouff mortgage allowed for acceleration "[a]t any time after," Malouff, at 304, the triggering event, and paragraph 8 similarly provides for acceleration "at any time thereafter."
[7] The trustees make "no allegations of fraudulent or unconscionable conduct by the bank, or laches, which might give rise to equitable defenses to be used by a borrower in such a situation [i.e. delayed acceleration]." Dunham v. Ware Sav. Bank, 384 Mass. at 74 n. 12.
[8] The 1981 regulations cited herein are identical to those appearing in 1982, and no reference will be made to the later citation.
[9] This regulation was codified initially in 12 C.F.R. § 545.6-11(f), effective July 31, 1976. It was promulgated as a result of increasing concern by the Federal Home Loan Bank Board "as to the authority of a federal savings and loan association to exercise a `due-on-sale' clause." Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141, 145 (1982).
[10] The fact that residential mortgages were the vehicle by which § 545.8-3(f) was brought before the Court is a distinction which provides no difference of substance. The underlying purpose of § 545.8-3(f), as expressed by the board, pertains to all "due-on-sale" clauses. "[T]he federal associations' practice of borrowing short and lending long, ... combined with rising interest rates, has increased the cost of funds to these institutions and reduced their income. Exercising due-on-sale clauses enables savings and loans to alleviate this problem by replacing long-term, lowyield loans with loans at the prevailing interest rates and thereby to avoid increasing interest rates across the board." Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. at 168-169. It is not our function to question the "economic soundness" of the board's position. Id. at 169-170.