434 So.2d 247 (1983)
Sara POWELL, et al.
v.
PHENIX FEDERAL SAVINGS & LOAN ASSOCIATION.
81-758.
Supreme Court of Alabama.
June 17, 1983.
*248 David S. Yen, of Legal Services Corporation of Ala., Opelika, for appellants.
Robert P. Lane, of Phillips & Funderburk, Phenix City, for appellee.
BEATTY, Justice.
This appeal involves a mortgage foreclosure begun when the plaintiffs sold part of their land in order to be able to keep their house. The plaintiffs brought suit to enjoin foreclosure by the defendants. The issue is whether the trial court erred in allowing foreclosure based on the due-on-sale clause in the mortgage. We reverse and remand for further consideration by the trial court.

FACTS
The plaintiffs-appellants, Sara and Era Powell, live in a house on 46 acres of land that Sara Powell inherited. On November 30, 1978, they borrowed $25,000 from the defendant-appellee, Phenix Federal Savings & Loan Association, to make home improvements and repay debts. The Powells signed a promissory note and as security gave a mortgage on the property, which was unimproved except for the house. The interest rate on the note was 11% per annum and the monthly payments were $284.15.
When Mr. and Mrs. Powell signed the note and mortgage, they were not represented by an attorney and did not read the documents. In reference to the mortgage, Mr. Powell later testified, "If I had read it, I wouldn't have understood it." The note, unlike the mortgage, contained a prepayment penalty clause.[1] The Powells testified without contradiction that an employee of Phenix Federal explained that they could not pay off the loan during the first year but did not explain the consequences of selling the property under the mortgage.
The mortgage document signed by the parties was the FNMA/FHLMC Uniform Mortgage Instrument, which was developed by the Federal National Mortgage Association *249 and the Federal Home Loan Mortgage Corporation. This document contains a due-on-sale clause reading as follows:
"17. Transfer of the Property: Assumption. If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Mortgage, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at lender's option, declare all the sums secured by this Mortgage to be immediately due and payable. Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Lender and that the interest payable on the sums secured by this Mortgage shall be at such rate as Lender shall request. If Lender has waived the option to accelerate provided in this paragraph 17, and if Borrower's successor in interest has executed a written assumption agreement accepted in writing by Lender, Lender shall release Borrower from all obligations under this Mortgage and the note.
"If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the note is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof."
Under this clause, therefore, the Powells were to obtain Phenix Federal's prior written consent to transfer all or part of the property in order to avoid acceleration of the debt. Alternatively, Phenix Federal could waive its acceleration rights by approving the prospective buyer's creditworthiness and a new interest rate.
The Powells used the loan proceeds to repay debts and make extensive home improvements. About a year after the loan was made, Mr. Powell underwent surgery and had to stop working. Because at that point their only regular income was Mrs. Powell's social security benefit, they experienced difficulty in making the mortgage payments.
To reduce their financial burdens, the Powells considered selling part of their land. In the fall of 1980, Johnny and Cora Jenkins contacted the Powells and agreed to buy 35 acres of land for a $4,600 down payment and assumption of the mortgage in full. The Powells would keep 11 acres with the house and pay taxes and insurance.
The Powells retained J.C. Perdue, who prepared a "warranty deed," stating the above terms. In a meeting with the Jenkinses at Perdue's office on November 6, 1980, the Powells signed the deed without reading it and received a $2,000 check from the Jenkinses. The Powells deposited this check in their bank and made a payment to become current on their mortgage at Phenix Federal, where they spoke with Robert DeGrange, a vice president. What was said is in dispute. According to Mr. Powell's testimony, he and his wife
"went into Mr. DeGrange's office and told him I had made arrangements with a friend of mine to take 35 acres of my land and make the payments on my property, and if he fell downbehind on them that maybe I could pick them up and maybe we wouldn't get behind any more on them; that I wanted to bring it up and make a payment up to date on it. He accepted thethe lady down at the cashier's desk accepted the money.... No one at that time told me that I could not sell the property, which I didn't sell it fully."
DeGrange testified as follows concerning the November 1980 discussion:

*250 "Mr. and Mrs. Powell were delinquent on their loan at that time. They came in, discussed with me the possibility of selling part of their land in order to make the payments. I told them at that time that if they were going to sell or transfer to let us know and we might be able to work something out with them at the time."
The Powells then paid the property taxes at the probate court and returned to their attorney's office where they left documents to be delivered to the Jenkinses. Thus, it is undisputed that the deed was executed before any possible notice to Phenix Federal; what notice was given before delivery of the deed to the Jenkinses is unclear.
The Jenkinses began making the $284.15 monthly payments to Phenix Federal in December 1980. The Jenkinses testified that they never agreed to pay more per month than the Powells had paid, nor did they agree to a higher rate of interest. The Jenkinses also testified that they did not receive a copy of the mortgage and were not told of any possible interest rate increase.
Phenix Federal's position is that it did not become aware of the transfer until some time in the spring of 1981 when confusion arose over an increase in the monthly payments to pay for insurance purchased by Phenix Federal. Both the Powells and the Jenkinses spoke with Robert DeGrange and William Bryan of Phenix Federal. At this time the loan file was turned over to Phenix Federal's attorneys. Both the Powells and the Jenkinses were told of the due-on-sale clause in the mortgage and of the possibility that payments could increase to reflect higher interest rates. Phenix Federal's witnesses testified that the rate sought was 15% or 16%, which was still below the market rate.
On June 10, 1981, Phenix Federal's attorney wrote the Powells, demanding full payment of $22,936.72 within ten days to avoid foreclosure (the due-on-sale clause allows the borrower 30 days from notice of acceleration to pay). Payment was not made and a nonjudicial foreclosure sale was advertised to be held on July 30, 1981.
On July 23 the Powells, represented by J.C. Perdue, filed the present action to enjoin foreclosure, and on July 29 a preliminary injunction was granted. On August 26, 1981, a hearing was held and the injunction was dissolved on September 1. Phenix Federal had continued to accept monthly payments from the Jenkinses through August, but refused the payment they tendered for September. On September 3 and 4, 1981, Phenix Federal sent new demand letters to the Powells, giving them 30 days to make full payment and avoid foreclosure. On September 22, 1981, the Powells, represented by different attorneys, filed a motion for a new trial, which was granted on October 19. Mr. and Mrs. Jenkins were made parties, a preliminary injunction was reentered, and the Powells filed an amended complaint. On November 24 a hearing was held to determine whether the preliminary injunction should continue in effect.
A final hearing on the merits took place on February 2, 1982, and the trial court found in favor of Phenix Federal. The judgment, as amended on motion of Phenix Federal, held that the conveyance to the Jenkinses is not a junior encumbrance under part (a) of the due-on-sale clause, that Phenix Federal has not consented to the sale to the Jenkinses, that Phenix Federal and the Jenkinses have not agreed upon a new interest rate, that the sale breached the terms of the mortgage, and that Phenix Federal has not waived its option to accelerate.

ENFORCEMENT OF THE DUE-ON-SALE CLAUSE
A threshold issue in this case is whether federal law preempts any Alabama law limiting the enforceability of due-on-sale clauses. In 1976 the Federal Home Loan Bank Board issued a regulation, now 12 CFR § 545.8-3(f) (1982), confirming the authority of federal savings and loan associations to include due-on-sale clauses in mortgage contracts. Recently the United States Supreme Court has held that this regulation *251 "was meant to pre-empt conflicting state limitations on the due-on-sale practices of federal savings and loans," Fidelity Federal Savings & Loan Association v. de la Cuesta, ___ U.S. ___, 102 S.Ct. 3014, 3025, 73 L.Ed.2d 664 (1982).
This preemption argument has only been asserted on appeal. Phenix Federal never cited the federal regulation and never otherwise argued preemption at the trial level. Moreover, in this case federal preemption operates as an affirmative defense that is waived if not pleaded. Rule 8(c), Alabama Rules of Civil Procedure; Robinson v. Morse, 352 So.2d 1355 (Ala.1977).
Since the federal regulation cannot be applied here, the trial court correctly relied on Tierce v. APS Co., 382 So.2d 485 (Ala. 1980), for the applicable standard of law. In that case APS Co. sold an apartment complex it held under mortgage, and the mortgagee began foreclosure proceedings based on the due-on-sale clause. We reversed the trial court's granting of an injunction against foreclosure. The "determinative issue" was "whether a due-on-sale clause is per se invalid, unless a separate consideration has been given for it, when the mortgagee's primary purpose for accelerating payment is to obtain a higher interest rate," id. at 486. We found this to be a "valid business purpose," subject to certain limitations:
"We further recognize that `due-on-sale' clauses are not enforceable in every situation since mortgage foreclosure is generally an equitable matter; thus a court of equity might refuse to foreclose a mortgage when acceleration of the due date for payment of the note secured by it would render the acceleration unconscionable and the result would be inequitable and unjust."
Id. at 487. We concluded that there was no evidence foreclosure would be unconscionable, noting that APS Co.'s own attorney had prepared the mortgage. See also McJenkin v. Central Bank of Tuscaloosa, N.A., 417 So.2d 153 (Ala.1982) (temporary injunction granted against foreclosure to enforce due-on-sale clause).
Our scope of review is limited. Granting injunctive relief under Rule 65, A.R.Civ.P., is within the trial court's sound discretion, especially when the facts are in dispute and evidence was presented ore tenus. Paint Rock Properties v. Shewmake, 393 So.2d 982 (Ala.1981); City Council of City of Prichard v. Cooper, 358 So.2d 440 (Ala.1978). The trial court's exercise of its discretion is subject to reversal when it is in violation of some principle of equity or based on misapprehension of controlling law. Lorch, Inc. v. Bessemer Mall Shopping Center, Inc., 294 Ala. 17, 20, 310 So.2d 872 (1975); McJenkin v. Central Bank of Tuscaloosa, N.A., supra.
Examination of the judgment below reveals that the trial court misapprehended the law as stated in Tierce, supra. Its factual findings were relevant to whether the due-on-sale clause was triggered, not to whether enforcement of the clause would be inequitable in light of the particular factors cited by the parties. The trial court's only finding specifically directed to the Tierce standard simply concerned the validity of the purpose for acceleration:
"Phenix Federal has accelerated the outstanding loan balance because the interest rate it has to pay to obtain monies for lending have increased. This is the reason for Phenix Federal's acceleration of the sum due. The acceleration is for a valid business purpose."
The trial court concluded that the Tierce case is "dispositive" and "requires that the plaintiff's petition be denied." We disagree. In view of the factual differences between the two cases, Tierce could be dispositive here only if it held that a due-on-sale clause is enforceable whenever the lender accelerates to obtain a higher interest rate, regardless of other circumstances. The Tierce opinion cannot be read in this way, because it gave separate consideration to the question of enforceability after determining that the lender's valid business purpose was to obtain a higher interest rate.
The trial court may also have taken the view that Tierce was dispositive because *252 the due-on-sale clause in this case specifically allows the lender to demand a higher interest rate as a condition to waiving its acceleration rights. Thus, no question arises here of a "hidden purpose" to raise the interest rate. This question was important to the dissenters from denial of rehearing in Tierce and to the Court of Civil Appeals in First Southern Federal Savings & Loan Association of Mobile v. Britton, Ala.Civ.App., 345 So.2d 300 (1977), which was overruled by Tierce. The Tierce majority opinion itself did not reach this question because the instrument construed lacked the specific language used here. We must determine, then, whether use of a due-on-sale clause to obtain a higher interest rate is permissible whenever the mortgage instrument so provides. In other words, we must determine whether the mere presence of specific language in the mortgage precludes further inquiry into the equities of any case where the lender's actual purpose is to increase the interest rate. In our view to preclude as a matter of law further inquiry into enforcement of the clause would unduly limit the traditional oversight powers of courts of equity. For the reasons discussed below, this may be a case in which further inquiry is appropriate. Therefore, we find it necessary for the trial court on remand to separately consider whether acceleration would be inequitable or unconscionable in the particular circumstances presented.
The Tierce opinion did not define what circumstances would render enforcement of a due-on-sale clause inequitable or unconscionable. In addition this case differs from Tierce and from most other due-on-sale clause cases in that here the mortgagor sold only a part of the property. To assist the trial court in applying the Tierce standard to the facts presented here, we make some further observations on that standard.
In Tierce we upheld the lender's desire to obtain a higher rate of interest on transfer because we found that doing so is a legitimate way for a lender to pass on its costs:
"With the tremendous rise in interest rates, lenders are forced to try to obtain higher interest rates because they are forced to pay higher interest in order to obtain funds for lending.... `Finally analyzed, the situation here is simply that [the mortgagors] can sell their property at a higher price if they can sell it at the lower interest rate.... In this situation equity should not depart from the law which requires it to enforce valid contracts and strike down the acceleration option simply because its exercise will let the [mortgagees], not the [mortgagors] make the profit on the interest rate occasioned by the increased cost of money.'"
Id. at 488, quoting Gunther v. White, 489 S.W.2d 529, 532 (Tenn.1973). See also Subcommittee on "Due-On" Clauses of the Committee on Real Estate Financing, Section of Real Property Probate and Trust Law, American Bar Association, "Enforcement Of Due-On-Transfer Clauses," 13 Real Prop. Prob. & Trust J. 891, 916, 925-29 (1978). In these cases both parties have an investment interest to protect, and in Tierce we simply allowed the parties to place some economic risk on the mortgagor, who may still be better off than he would be with a variable rate mortgage. Indeed, from a policy perspective, due-on-sale clauses may benefit not only lending institutions but also borrowers as a class. If market forces operate, lower mortgage rates should result from a reduction in the average time a mortgage loan is outstanding, which reduces the interest rate risk to which lenders are subject in any fixed rate mortgage. Dunham v. Ware Savings Bank, 384 Mass. 63, 423 N.E.2d 998, 1001-2 (Mass.1981). Moreover, due-on-sale clauses remove the advantage otherwise held by sellers who happen to be able to offer low interest mortgages and by buyers who have sufficient net worth to more easily assume existing mortgages. G. Osborne, G. Nelson and D. Whitman, Real Estate Finance Law 307-8 (1979).
Tierce involved a commercial mortgage, but its holding is beneficial from the borrower's point of view in the context of residential mortgages as well. A residential mortgagor has not only an investment interest to protect but also an interest in *253 keeping his home as a place to live. From this standpoint a due-on-sale clause is a reasonable compromise between a variable rate mortgage, which gives the borrower no protection against economic forces that may make his home unaffordable, and a fixed rate, assumable mortgage, which a lender might accept only at an interest rate that the borrower could not afford from the outset. With the due-on-sale clause in a fixed rate mortgage, the borrower is free from the effects of rising interest rates until he decides to sell and no longer needs his home as a place to live. At this point he may experience some difficulty in selling the home without a considerable reduction in the sale price. Such an outcome is reasonable for a residential mortgagor for whom investment considerations are secondary. "Usually, at least in the residential setting, the borrower is concerned most with his immediate cost ... not ... with his mortgage as a method for facilitating a future sale of his home." Real Estate Finance Law, supra, at 307. "So long as the homeowner continues to own and occupy the house, he is interested in the protection against call, in the preservation of his right not to pay more than the level monthly payment fixed at the outset." Williams v. First Federal Savings & Loan Association of Arlington, 651 F.2d 910, 924 (4th Cir. 1981).
This perspective is important in any case where a homeowner seeks to keep his residence as a place to live by transferring some other parts of the property under mortgage. Clearly, the due-on-sale clause's effect on the interests to be balanced by a court of equity would be different in the case of a property owner seeking to keep unimproved land. It is from this perspective that the trial court must consider whether enforcement of the due-on-sale clause here would be unconscionable or inequitable. We emphasize that this approach is consistent with a "focus on the reasonable expectations of the mortgagor at the time a mortgage loan is made." Real Estate Finance Law, supra, at 307. Such scrutiny by a court of equity need not amount to rewriting the mortgage contract.
Accordingly, we remand the case for the trial court to make further findings in accordance with this opinion.
REVERSED AND REMANDED.
EMBRY and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX and SHORES, JJ., concur specially.
FAULKNER, JONES and ALMON, JJ., concur in the result.
TORBERT, Chief Justice (concurring specially).
In Tierce v. APS Company, 382 So.2d 485 (Ala.1980), I dissented on application for rehearing, since it was my opinion that we should have affirmed the trial court because of its specific findings, Tierce at 489, that the due-on-sale clause was not openly stated and bargained for, that the lender's security was not endangered by the sale, and that the lender's exercise of his rights under the clause was to force an increase in the interest rate originally bargained for. Accordingly, I would reverse and remand this case to the trial court for its findings and determinations consistent with my dissent in Tierce.
MADDOX and SHORES, JJ., concur.
FAULKNER, Justice (concurring in the result).
I concur to send the case back to the trial court to consider whether the enforcement of the due-on-sale clause would be unconscionable or inequitable.
Personally, I have some reservations about the equity of due-on-sale clauses in mortgages. I wonder how many mortgagors have any knowledge of the clause, and its significance, when they sign the mortgage.
JONES, Justice (concurring in the result).
For reasons not here important, I did not vote in Tierce, supra. Had I voted, I would have joined those dissenting on rehearing, reasoning that due-on-sale clauses, which vary in fixed terms of the mortgage note *254 and which, in practical effect, always inure to the benefit of the creditor and never to the benefit of the debtor, are void as against public policy. But Tierce is the law of this State; and, in the interest of stability, I will not persist in my personal views to the contrary.
While I am less than comfortable with the lack of specific guidelines for the application of "equitable principles," I concur in the result of the instant opinion. It is my hope, and belief, that the evolving nature of the common law process will develop a more definitive set of principles, so that parties to contracts containing due-on-sale clauses can more readily understand their respective rights and obligations.
NOTES
[1] The note's provisions concerning prepayment are as follows: "Borrower may prepay the principal amount outstanding in whole or in part. The Note holder may require that any partial prepayments (i) be made on the date monthly installments are due and (ii) be in the amount of that part of one or more monthly installments which would be applicable to principal. Any partial prepayment shall be applied against the principal amount outstanding and shall not postpone the due date of any subsequent monthly installments or change the amount of such installments, unless the Note holder shall otherwise agree in writing. If, within five years from the date of this Note, Borrower make(s) any prepayments in any twelve month period beginning with the date of this Note or anniversary dates thereof (`loan year') with money lent to Borrower by a lender other than the Noteholder, Borrower shall pay the Note holder (a) during each of the first three loan years 5.5 percent of the amount by which the sum of prepayments made in any such loan year exceeds twenty percent of the original principal amount of this Note and (b) during the fourth and fifth loan years 3 percent of the amount by which the sum of prepayments made in any such loan year exceeds twenty percent of the original principal amount of this Note."